UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JORDAN KASPERZYK,

        Plaintiff,

    v.

SHETLER SECURITY SERVICES, INC.,
*et al.*,

        Defendants.

_____/

No. C-13-3383 EMC

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT
SHETLER SECURITY SERVICES,
INC.'S MOTION TO DISMISS**

**(Docket No. 22)**

    Plaintiff Jordan Kasperzyk has filed suit against Defendants Shetler Security Services, Inc.
("SSS"); Lucasfilm Ltd.; Letterman Digital Arts Ltd. ("Letterman"); Skywalker Properties; and
Michael Shetler.  Currently pending before the Court is SSS's motion to dismiss.  Although the
current operative complaint is the second amended complaint ("SAC"), that complaint was not filed
at the time of the briefing on SSS's motion, nor was it filed at the time of the hearing on the motion.
Accordingly, for purposes of this opinion only, the Court refers to then-governing complaint, *i.e.*,
the first amended complaint ("FAC").

    Having considered the parties' briefs as well as the oral argument of counsel, the Court
hereby **GRANTS** in part and **DENIES** in part the motion to dismiss.

## I.    FACTUAL & PROCEDURAL BACKGROUND

    In the FAC, Mr. Kasperzyk alleges as follows.

    Mr. Kasperzyk is a licensed security guard.  *See* FAC ¶ 14.  In 2008, he was hired by a
company named Advanced-Tech, which at that time provided security at Lucasfilm's Letterman

**United States District Court**
For the Northern District of California

1   Digital Arts Center (located in the Presidio).  *See* FAC ¶ 14.  As a new hire with Advanced-Tech,

2   Mr. Kasperzyk was required to join a local union.  *See* FAC ¶ 17.

3       In January 2010, while working for Advanced-Tech, Mr. Kasperzyk hurt his back "when a

4   motorist whose car he had ticketed for over parking [at the Center] struck him with his car."  FAC ¶

5   26.  He was able to return to work but "on a limited basis, with medically prescribed work

6   restrictions.  These work restrictions prohibited him from any heavy lifting, and required a post that

7   would permit him to vary his position by alternately sitting or standing occasionally for several

8   minutes at a time to relieve the stress on his back."  FAC ¶ 28.

9       In or about May 2010, Advanced-Tech lost its contract with Lucasfilm to provide security,

10  with SSS being hired in Advanced-Tech's place.  *See* FAC ¶¶ 7, 29.  Advanced-Tech employees

11  were told that Advanced-Tech would be leaving but that "anyone who wished to remain at the

12  Center and work for [SSS] could do so by simply signing up."  FAC ¶ 29.  Mr. Kasperzyk did so, in

13  part to protect his housing situation with the Presidio Trust which required employment with an

14  employer on the Presidio.  *See* FAC ¶ 29.  Mr. Kasperzyk's allegations indicate that the contract for

15  security services was ultimately entered into by SSS and Letterman.  *See* FAC ¶ 31 (referring to an

16  Independent Contract Agreement between SSS and Letterman).  The security services contract

17  included a provision (¶ 26) stating that "'[t]he validity, construction and performance of this

18  Agreement shall be governed and interpreted in accordance with the laws of the State of California

19  as applied to agreements between California residents which were entered into and to be performed

20  in the State of California, without regard to conflict of laws.'"  FAC ¶ 31.  The security services

21  contract also included a provision (¶ 8(b)) stating that "'[t]he Company shall not take any action

22  contrary to any applicable law, rule, regulation or order prohibiting discrimination against

23  employees . . . on the basis of . . . disability . . . or contrary to any other provision of law or this

24  Agreement.'"  FAC ¶ 32.

25      When SSS took over security, it signed not only a contract with Letterman but also a contract

26  with the local union.  The contract with the union included a provision (Article 3) that stated:

27          "The Union and the Company agree that they shall not discriminate in
            violation of federal and state law against any . . . employee in hiring,
28          promotions, assignments, suspensions, discharge, terms and conditions

United States District Court
For the Northern District of California

1    of employment, wages, training, recall or lay-off status . . . against a
     qualified individual with a disability (defined by the Americans with
2    Disabilities Act)."

3    FAC ¶ 18.  The contract also included a provision (Article 27.2) that stated:

4          "If a customer demands that the Company remove an employee from
           further employment at a location, the Company shall have the right to
5          comply with such demand.  However, unless the Company has cause
           to discharge the employee, the company will use its best efforts to
6          place him/her in another job in the same County not to exceed ten (10)
           miles from the job site from which he or she was removed, and
7          schedule said employee with no loss of wages, seniority or benefits
           and with the same shift."

8

9    FAC ¶ 19.

10         In November 2010, Mr. Kasperzyk was presented with a letter from SSS in which it stated

11   that his current posting was being eliminated at the behest of the client; that it was not able to

12   identify a posting where he could perform the essential job functions, either with or without

13   reasonable accommodation; and that it was therefore terminating his employment.  *See* FAC ¶ 35.

14   According to Mr. Kasperzyk, nothing stated in the letter was actually true.  *See* FAC ¶ 36.

15   Mr. Kasperzyk subsequently contacted the union to challenge the termination.  At a mediation held

16   in April 2011, SSS offered Mr. Kasperzyk his job back, and he accepted.[1]  *See* FAC ¶¶ 37-38.

17   However, just two days later, when Mr. Kasperzyk went to obtain a letter verifying his employment

18   with SSS, he was told by management that the client did not want him back and that he should

19   vacate the premises.  *See* FAC ¶ 39.

20         Based on, *inter alia*, the above allegations, Mr. Kasperzyk has asserted the following claims

21   against SSS:

22   (1)    Disability discrimination (California Fair Employment and Housing Act ("FEHA")).

23          According to Mr. Kasperzyk, the adverse employment actions taken by SSS were (a)

24          terminating him in November 2010 (*i.e.*, pre-mediation) and then (b) terminating him a

25          second time in April 2011 (*i.e.*, post-mediation).  *See* FAC ¶ 47.

26   _____

27          [1] In his opposition, Mr. Kasperzyk states that, although he referenced a mediation in the
     FAC, "closer inquiry reveals that the process was actually an arbitration proceeding."  Opp'n at 22.
28   "[T]he contract between [SSS] and the Union characterizes the process as an 'arbitration.'"  Opp'n at
     22.

3

(2)     Breach of contract.  This claim for breach of contract is based on the contract between SSS and Letterman.  Mr. Kasperzyk maintains that he was a third-party beneficiary of the contract and that SSS breached the contract by discriminating against him on the basis of disability.  *See* FAC ¶¶ 54-55.

(3)     Breach of contract.  This claim for breach of contract is based on the contract between SSS and the local union.  Mr. Kasperzyk maintains that he was a third-party beneficiary of the contract and that SSS breached the contract (a) by discriminating against him on the basis of disability and (b) by failing to use its best efforts to place him in another job after terminating him in November 2010.  *See* FAC ¶¶ 61-62.

(4)     Breach of contract.  This claim for breach of contract is based on the oral agreement made during the mediation in April 2011.  According to Ms. Kasperzyk, SSS made an offer to reinstate him, which he accepted, and SSS subsequently violated that agreement by failing to re-employ him.  *See* FAC ¶¶ 65-66.

(5)     Breach of the implied covenant of good faith and fair dealing.  This claim is based on the employment agreement between SSS and Mr. Kasperzyk.  Mr. Kasperzyk asserts that SSS breached the implied covenant because, each time SSS terminated Mr. Kasperzyk, it did not have good and sufficient cause to do so which amounted to an unfair interference with the right of Mr. Kasperzyk to receive the benefit of the contract.  *See* FAC ¶ 73.

(6)     Retaliation (FEHA).  According to Mr. Kasperzyk, after he alerted SSS to ongoing discrimination against another employee (Abbas Idris) on the basis of his religion and race, he was terminated.  *See* FAC ¶¶ 77-78, 102-03.

(7)     Failure to prevent discrimination and harassment (FEHA).  According to Mr. Kasperzyk, SSS "was on notice that it had an obligation to prevent its disabled employees from discrimination and harassment in its workplace," but, in spite of that notice, SSS "took no action to protect [him] once he disclosed his protected status as a disabled person."  FAC ¶ 84.  Rather, SSS terminated him on two different occasions – first in November 2010 and then in April 2011.  *See* FAC ¶ 85.

United States District Court

For the Northern District of California

(8)     Wrongful termination in violation of public policy.  Mr. Kasperzyk asserts that, even though his job performance was satisfactory and he was capable of performing his duties with or without reasonable accommodation, SSS terminated him on the basis of his disability.  *See* FAC ¶¶ 91-93.

(9)     Fraud (common law).  Mr. Kasperzyk alleges that, when SSS promised to reinstate him at the mediation in April 2011, it knew the promise was false.  *See* FAC ¶¶ 97-98.  According to Mr. Kasperzyk, he relied on the promise by foregoing any claims in union mediation in exchange for getting his job back.  *See* SAC ¶ 99.

(10)    Intentional infliction of emotional distress.

## II.     DISCUSSION

A.     Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss based on the failure to state a claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(6).  A motion to dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims alleged.  *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  In considering such a motion, a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal."  *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).  While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.*  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully."  *Iqbal*, 129 S. Ct. at 1949.

B.     FEHA Claims

As indicated above, Ms. Kasperzyk has alleged three FEHA claims in the FAC (*i.e.*, a claim for disability discrimination, a claim for retaliation, and a claim for failure to prevent discrimination

5

**United States District Court**

For the Northern District of California

1  and harassment). SSS argues that these claims should all be dismissed based on the federal enclave

2  doctrine – *i.e.*, because the Presidio is a federal enclave,[2] and therefore the only law that governs is

3  (1) federal law and (2) state law as it existed *before* the enclave was established. *See, e.g.*, *Naigan v.*

4  *Nana Servs.*, No. 12cv2648-LAB (NLS), 2013 U.S. Dist. LEXIS 133751, at *3 (S.D. Cal. Sept. 18,

5  2013) (stating that, "[u]nder the federal enclave doctrine, federal jurisdiction over the newly-

6  acquired land because exclusive" and "[s]tate law has effect in the [federal] enclave only if it was

7  enacted before the land became a federal enclave (and assuming it is consistent with federal law),

8  unless Congress has authorized the state to exercise authority (such as by enacting an assimilative

9  statute) or powers are reserved to the state at the time fo the transfer").

10      SSS's federal enclave argument draws on Article I, § 8, clause 17 of the Constitution and

11  Supreme Court authority including, *inter alia*, *Paul v. United States*, 371 U.S. 245 (1963).

12      Article I, § 8, clause 17 provides that Congress shall have power "[t]o exercise *exclusive*

13  *Legislation* in all Cases whatsoever" over the District of Columbia and "to exercise like Authority

14  over all Places purchased by the Consent of the Legislature of the State in which the Same shall be,

15  for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." Const.,

16  art. I, § 8, cl. 17 (emphasis added). "Exclusive legislative power is in essence complete sovereignty.

17  _____

18      [2] SSS has asked the Court to take judicial notice of the fact that the Presidio is a federal
enclave. Mr. Kasperzyk has objected, noting that, in a different case, Judge Wilken refused to take

19  judicial notice of the purported fact that the Presidio is a federal enclave because that was a legal
conclusion. *See* Docket No. 42 (Opp'n at 1-2) (citing *Klausner v. Lucas Film Entm't Co.*, No. 09-

20  03502 CW, 2010 U.S. Dist. LEXIS 25944, at *4 (N.D. Cal. Mar. 19, 2010)).

21      However, in a subsequent case, Judge Wilken did find that the Presidio was a federal enclave
based on a California statute ceding the territory to the United States in 1897. *See Totah v. Bies*, No.

22  10-05956 CW, 2011 U.S. Dist. LEXIS 39940, at *4 (N.D. Cal. Apr. 6, 2011). Furthermore, other
courts in this District have also found that the Presidio is a federal enclave, whether by means of

23  judicial notice or the same California statute of 1897. *See, e.g.*, *Rosseter v. Industrial Light &
Magic*, No. C 08-04545 WHA, 2009 U.S. Dist. LEXIS 5307, at *3 (N.D. Cal. Jan. 27, 2009) (taking

24  judicial notice); *Swords v. Kemp*, 423 F. Supp. 2d 1031, 1034 (N.D. Cal. 2005) (Jenkins, J.) (taking
note of the 1897 California statute ceding the land). And notably, the Supreme Court has indicated

25  that the Presidio is a federal enclave. *See Standard Oil Co. v. California*, 291 U.S. 242, 244 (1934)
(noting that, "[b]y Act of March 2, 1897, California ceded to the United States exclusive jurisdiction

26  over this area with a proviso – 'That this state reserves the right to serve and execute on said lands
all civil process, not incompatible with this cession, and such criminal process as may lawfully issue

27  under the authority of this state against any person or persons charged with crimes committed
without said lands'"). Finally, Mr. Kasperzyk has failed to point to any authority suggesting that the

28  Presidio is *not* a federal enclave. The Court therefore takes judicial notice that the Presidio is a
federal enclave.

**United States District Court**
For the Northern District of California

That is, not only is the federal property immune from taxation because of the supremacy of the Federal Government but state laws, not adopted directly or impliedly by the United States, are ineffective to tax or regulate other property or persons upon that enclave." *S.R.A., Inc. v. Minnesota*, 327 U.S. 558, 562-63 (1946).

In *Paul*, the Supreme Court was called upon to address the application of Article I, § 8, clause 17.  The United States had brought suit against the state of California, alleging that the state's price regulation of milk on Travis Air Force Base, a federal enclave, was barred by the Constitution because Travis was subject to the exclusive jurisdiction of the United States.  *See id.* at 248.  In evaluating this issue, the Supreme Court began by taking note that, under Article I, § 8, clause, "if the United States acquires with the 'consent' of the state legislature land within the borders of that State by purchase or condemnation for any of the purposes mentioned in Art. I, § 8, cl. 17, or if the land is acquired without such consent and later the State gives its 'consent,' the jurisdiction of the Federal Government becomes 'exclusive.'" *Id.* at 264.  The Court added that "a State may not legislate with respect to a federal enclave unless it reserved the right to do so when it gave its consent to the purchase by the United States." *Id.* at 268.  Absent such a reservation, "*only state law existing at the time of the acquisition remains enforceable, not subsequent [state] laws.*" *Id.* (emphasis added).  It is not disputed that FEHA did not exist in California law at the time the Presidio land was ceded to the federal government in 1897.

In response to the federal enclave argument, Mr. Kasperzyk makes several contentions:

(1)     that the Presidio was not made a federal enclave pursuant to Article I, § 8, clause 17 and therefore *Paul* and other cases based on that constitutional provision are not applicable (or at least are not dispositive);

(2)     unless a federal government interest is implicated as in *Paul*, state law should apply on the federal enclave;

(3)     the rule laid out in *Paul* has effectively been displaced or at least tempered by *Howard v. Commissioners of Sinking Fund*, 344 U.S. 624 (1953), and *Evans v. Cornman*, 398 U.S. 419 (1970); and

United States District Court

For the Northern District of California

(4)     even if the *Paul* rule were to apply, Congress's enactment of 16 U.S.C. § 457 allows "modern" state law to apply (*i.e.*, state law developed or enacted after the establishment of the federal enclave).

The Court addresses each of these arguments in turn.

### 1.     Cession of the Presidio

Mr. Kasperzyk contends first that the cession of the Presidio to the United States was not made pursuant to the Constitution (Article I, § 8, clause 17), but he has failed to adequately establish such. For example, he has not shown that the cession in 1897 from California to the federal government was without the consent of the state and for a purpose other than the erection of forts, magazines, arsenals, dockyards, and other needful buildings. Furthermore, in *Standard Oil*, the Supreme Court expressly noted that the Presidio was a military reservation which, "[b]y Act of March 2, 1897, [was] ceded to the United States [for] *exclusive jurisdiction*." *Standard Oil*, 291 U.S. at 244 (also stating that "by the Act of 1897 California surrendered every possible claim of right to exercise *legislative authority* within the Presidio – put that area beyond the field of operation of her laws") (emphasis added); *see also Swords*, 423 F. Supp. 2d at 1034 (concluding that the Presidio is a federal enclave pursuant to Article I, § 8, clause 17).

### 2.     Federal Government Interest

Mr. Kasperzyk argues next that state law should apply on a federal enclave unless a federal government interest is implicated, as was the case in *Paul*. However, *Arlington Hotel Co. v. Fant*, 278 U.S. 439 (1929), effectively renders this argument meritless.

In *Arlington Hotel*, the plaintiffs filed suit against a hotel, located in a national park, seeking to recover losses they sustained while guests of the hotel. According to the plaintiffs, the governing law for their claims was the common law then in force at the time that the United States acquired from the state exclusive jurisdiction over the national park. The defendant argued that law enacted by the state legislature after acquisition was controlling instead. *See id.* at 445-46 (noting that, under pre-acquisition common law, "an innkeeper was an insurer of his guests' personal property against fire" but that, post-acquisition, "the Arkansas Legislature enacted a law relieving innkeepers from liability to their guests for loss by fire, unless it was due to negligence").

United States District Court

For the Northern District of California

Ultimately, the Supreme Court held in favor of the plaintiffs (*i.e.*, followed the *Paul* rule), that is, after finding that exclusive jurisdiction over the territory where the hotel was located had in fact been ceded to the United States by Arkansas consistent with Article I, § 8, clause 17 of the Constitution.  Notably, the Court stated that the constitutional basis for the federal government's acquisition of the enclave was not "any less effective because the [hot] springs . . . kept safely available for the Federal purpose *do in the abundance of their flow also supply water sufficient to furnish aid to the indigent and to those of the public who are able to pay for hotel accommodation on the little park surrounding the hospital and the springs*."  *Id.* at 455 (emphasis added).   In other words, in *Arlington Hotel*, the *Paul* rule was applied even though private parties only were involved and the federal government's interest was, at best, extremely limited – effectively that of a landlord. *Arlington Hotel* remains good law.  Relying on *Arlington Hotel*, the Supreme Court decided after *Paul* that "exclusive federal jurisdiction [is] not lost . . . by lease of property for commercial purposes within an enclave."  *Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369, 373 (1964); *see also James Stewart & Co. v. Sadrakula*, 309 U.S. 94, 99-100 (1940) (discussed *infra*).  No case has expressly overruled or questioned *Arlington Hotel* and its progeny.

At the hearing, Mr. Kasperzyk failed to explain how the circumstances in *Arlington Hotel* are materially different from those here, at least with regard to the role of the federal government interest as indispensable (or not) to application of the federal enclave doctrine.  Here, as in *Arlington Hotel*, the federal government interest is essentially that of a landlord, who leases out property on the Presidio to private interests such as the Letterman-related entities.  As in *Arlington Hotel*, Article I, § 8, clause 17 of the Constitution applies.

3.    *Howard* and *Evans*

In his third argument, Mr. Kasperzyk asserts that other Supreme Court authority – namely, *Howard* and *Evans* – implicitly displaces or tempers *Paul*.  The Court briefly recites the rulings in *Howard* and *Evans* and then evaluates Mr. Kasperzyk's argument.

In *Howard*, which was decided before *Paul*, the Supreme Court addressed whether the city of Louisville could impose an occupational tax or license fee on individuals who worked in a Naval Ordnance Plant, located on a federal enclave.  *See Howard*, 344 U.S. at 624.  The employees argued

**United States District Court**

For the Northern District of California

1   that the local tax was improper because the federal government had exclusive jurisdiction over the

2   federal enclave.

3          In examining this issue, the Court began by noting that the mere fact the city had "annexed"

4   the part of the federal enclave containing the Ordnance Plant (*i.e.*, put it within the city's

5   geographical boundaries) was not constitutionally problematic.

> When the United States, with the consent of Kentucky, acquired the property upon which the Ordnance Plant is located, the property did not cease to be a part of Kentucky.  The geographical structure of Kentucky remained the same.  In rearranging the structural divisions of the Commonwealth, in accordance with state law, the area became a part of the City of Louisville, just as it remained a part of the County of Jefferson and the Commonwealth of Kentucky.  *A state may conform its municipal structures to its own plan, so long as the state does not interfere with the exercise of jurisdiction within  the federal area by the United States.*  Kentucky's consent to this acquisition gave the United States power to exercise exclusive jurisdiction within the area.  *A change of municipal boundaries did not interfere in the least with the jurisdiction of the United States within the area or with its use or disposition of the property.  The fiction of a state within a state can have no validity to prevent the state from exercising its power over the federal area within its boundaries, so long as there is no interference with the jurisdiction asserted by the Federal Government.*  The sovereign rights in this dual relationship are not antagonistic.  Accommodation and cooperation are their aim. It is friction, not fiction, to which we must give heed.

17   *Id.* at 626-27 (emphasis added).

18          But even though the *annexation* by the city was not a problem, that did not mean that the city

19   could thereby *tax* those who worked on the annexed area.  The Court stated: "Even though the

20   Ordnance Plant is within the boundaries of the City of Louisville pursuant to the annexation,

21   *exclusive jurisdiction over the area still remains within the United States*, except as modified by [a

22   federal] statute."  *Id.* at 627 (citing U.S. Const., art. I, § 8, cl. 17).  Ultimately, the Supreme Court

23   did hold that the city could tax the individuals who worked in the Ordnance Plant but the court did

24   not rely on an interference analysis in concluding such.  Rather, the Court determined that the city

25   could tax the individuals only because Congress had authorized the taxation through the Buck Act.

26   *See id.* (noting that "the right to tax income paid to employees of the Government who worked at the

27   Ordnance Plant was granted by 4 U.S.C. §§ 105-110, known as the Buck Act").

28

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In *Evans* (a case that post-dates *Paul*), plaintiffs were individuals who lived on a federal enclave located within the geographical boundaries of Montgomery County in Maryland.  After the county announced that plaintiffs did not meet the residency requirement of the state constitution and therefore could not vote in state elections, plaintiffs filed suit.  *See Evans*, 398 U.S. at 419.  Notably, persons who lived in the area before it became a federal enclave were allowed to vote.  *See id.* at 421.  *Evans* relied in part on *Howard* in affirming the decision in favor of plaintiffs:

> [Plaintiffs] clearly live within the geographical boundaries of the State of Maryland, and they are treated as state residents in the census and in determining congressional apportionment.  They are not residents of Maryland only if the [enclave] grounds ceased to be a part of Maryland when the enclave was created.  However, that "fiction of a state within a state" was specifically rejected by this Court in *Howard v. Commissioners of Louisville*.

*Id.*

The Supreme Court then addressed the defendants' contention that, "*even if* [plaintiffs] are residents of Maryland [*i.e.*, because there is no state within a state], the State may [still] constitutionally structure its election laws so as to deny them the right to vote."  *Id.* at 422 (emphasis added).  In response to this second argument, the Court conducted an equal protection analysis to which strict scrutiny applied because the right to vote was a fundamental one.  "[B]efore that right can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny."  *Id.*  According to the defendants, "[t]he sole interest or purpose . . . to justify the limitation on the vote . . . is essentially to insured that only those citizens who are primarily or substantially interested in or affected by electoral decisions have a voice in making them."  *Id.*  The problem, the Court stated, was that "there are numerous and vital ways in which [enclave] residents are affected by electoral decisions" – for example, "[plaintiffs] are required to register their automobiles in Maryland and obtain drivers' permits and license plates from the State; they are subject to the process and jurisdiction of state courts; they themselves can

United States District Court

For the Northern District of California

1   resort to those courts in divorce and child adoption proceedings; and they send their children to

2   Maryland public schools."[3]  *Id.* at 424.

3        According to Mr. Kasperzyk, *Howard* and *Evans* either displace or temper *Paul* as they stand

4   for the proposition that state law is permitted on a federal enclave so long as it does not interfere

5   with federal sovereignty.  There are several problems with this position.

6        First, it is a dubious proposition that *Howard* and *Evans* overruled or partially overruled the

7   *Paul* rule in the absence of an express statement by the Supreme Court that it was so doing.  As

8   indicated by the above, the *Paul* rule has been in existence at least since the 1920s, *see Arlington*

9   *Hotel*, 278 U.S. at 439, and has subsequently been reaffirmed by the Supreme Court.  For instance,

10  in *Stewart*, the Court concluded that acceptance of sovereignty by the United States did not displace

11  the existing state labor law.  It noted that the language of the Constitution "has long been interpreted

12  so as to permit continuance until abrogated of those rules existing at the time of the surrender of

13  sovereignty which govern the rights of the occupants of the territory transferred" as "[t]his assures

14  that no area . . . will be left without a developed legal system for private rights."  *Stewart*, 309 U.S.

15  at 99-100.  The Court then added: "[F]uture statutes of the state are not a part of the body of laws in

16  the ceded area" and "Congressional action is necessary to keep it current."  *Id.* at 100.  While the

17  *Stewart* Court did use interference language similar to that used in *Howard*, it did so only in

18  determining whether a state law should *continue* to govern on a federal enclave (*i.e.*, not in assessing

19  whether a *new* state law should government so long as there was no interference with federal

20  sovereignty).  *See id.* at 103-04 (noting that, "[w]here enforcement of the state law would handicap

21  efforts to carry out the plans of the United States, the state enactment must, of course, give way").

22  As noted above, *Arlington Hotel* has been followed not only in *Stewart* but also in *Paul* and *Humble*

23  *Pipe Line Co.*

24        *Howard*, which was decided in 1953, said nothing about either *Arlington Hotel* or *Stewart*.

25  And *Paul*, which was based on well established law following *Arlington Hotel* and *Stewart*, was

26  _____

27        [3] Significantly, the Court in *Evans* repeatedly emphasized how Congress had "permitted the
    States to extend important aspects of state powers over federal areas."  *Evans*, 398 U.S. at 423.  This
    included the power to levy and collective income, gasoline, sales, and use taxes and to apply state
28  unemployment and worker's compensation law.  *See id.* at 424.

decided several years *after Howard* in 1963.  Thus, *Howard* could hardly be said to overrule *Paul*.

While *Evans* (a decision issued in 1970) did post-date *Paul*, it did not comment either on *Paul* or the

*Paul* rule, which was grounded in *Arlington Hotel* and its progeny.  Rather, for the most part, *Evans*

is an equal protection case with very limited reliance on *Howard* as discussed both above and below.

Second, although Mr. Kasperzyk takes a broad reading of *Howard*, such a reading is not

justified.  As noted above, the Supreme Court stated in *Howard*:

> *A state may conform its municipal structures to its own plan, so long as the state does not interfere with the exercise of jurisdiction within the federal area by the United States.*  Kentucky's consent to this acquisition gave the United States power to exercise exclusive jurisdiction within the area.  *A change of municipal boundaries did not interfere in the least with the jurisdiction of the United States within the area or with its use or disposition of the property.  The fiction of a state within a state can have no validity to prevent the state from exercising its power over the federal area within its boundaries, so long as there is no interference with the jurisdiction asserted by the Federal Government.*  The sovereign rights in this dual relationship are not antagonistic.  Accommodation and cooperation are their aim. It is friction, not fiction, to which we must give heed.

*Howard*, 344 U.S. at 626-27 (emphasis added).  While *Howard* did use the language of

"interference" and "friction," it did so simply in the context of assessing whether a federal enclave

remained within the geographical boundaries of a city or state.  The Court did not clearly say that the

interference standard should be applied beyond this specific context.  Indeed, the Court suggested

the exact opposite by going on to state that, "[e]ven though the [Naval] Ordnance Plant is within the

boundaries of the City of Louisville pursuant to the annexation, *exclusive jurisdiction over the area*

*still remains within the United States*, except as modified by statute."  *Id.* at 627 (emphasis added).

In other words, even though annexation (geographical boundaries) was an issue subject to

interference analysis, the issue of taxation was not.

Notably, in *Mississippi River Fuel Corp. v. Cocreham*, 382 F.2d 929 (5th Cir. 1967), the

Fifth Circuit endorsed this narrow reading of *Howard*, stating that,

> [b]y holding that the State of Kentucky and its political subdivisions retained control over their own geographic boundaries *Howard* did not therefore imply that a state has legislative power within a federal enclave unless exercise of that power interferes with the federal government.  The Supreme Court upheld the city's power to tax only because of express congressional authorization: The Court recognized that Congress alone had political control within the federal area.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   *Id.* at 937 n.17.  Similarly, the Sixth Circuit characterized *Howard* as simply standing for the

2   principle that "a military reservation within a state remains a *geographical* part of the city, county

3   and state of which it was part at the time of acquisition by the United States."  *First Hardin Nat'l*

4   *Bank v. Fort Knox Nat'l Bank*, 361 F.2d 276, 279 (6th Cir. 1996) (emphasis added).

5        Third, reading *Howard* broadly would run counter to the plain language of Article I, § 8,

6   clause 17, which provides that Congress shall have "exclusive Legislation" over a federal enclave.

7   "One commentator has forcefully argued that the recent cases, taken to their logical extreme, would

8   permit the extension of state governmental jurisdiction in its full scope over federal enclaves, subject

9   only to displacement by federal law – a view that would redefine the 'exclusive Legislation' clause

10  as conferring, not an exclusive power to legislate, but rather a power to legislate exclusively

11  whenever appropriate."  *Economic Dev. & Industrial Corp. v. United States*, 546 F. Supp. 1204,

12  1209-10 (D. Mass. 1982) (citing 14 Engdahl, State and Federal Power over Federal Property, 18

13  Ariz. L. Rev. 283, 288-90, 332-36, 376-82 (1976)), *rev'd on other grounds by* 720 F.2d 1 (1st Cir.

14  1983).  Mr. Kasperzyk's interpretation would effectively read Article I, § 18, clause 17 out of the

15  Constitution and subject state laws enforced in a federal enclave only to the Supreme Clause and

16  traditional preemption analysis.

17       Fourth, *Evans*' reliance on *Howard* did not extend the reach of *Howard* more broadly.

18  Indeed, as reflected above, *Evans* simply relied on *Howard* to conclude that enclave residents could

19  not be excluded as residents of the state because the concept of a federal enclave being a "state"

20  within a state was meritless, thus leaving the door open to equal protection review.  And notably, in

21  a 2012 decision, the Tenth Circuit explicitly rejected the contention that, under *Howard* and/or

22  *Evans*, "all state laws that do not conflict with federal law or policy are applicable on federal

23  enclaves."  *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1239 (10th Cir. 2012); *see also id.*

24  at 1239 n.2 (rejecting the legal treatise cited by Mr. Kasperzyk (*i.e.*, R. Haines, Jr., Federal Enclave

25  Law (2011), in his opposition to Lucasfilm's motion to dismiss; treatise suggested that, in *Evans*, the

26  Supreme Court "adopted and extended the 'no interference' rationale of *Howard* to the point of

27  largely overruling *Paul*").

28

United States District Court

For the Northern District of California

Fifth, Mr. Kasperzyk's attempt to overlay an equal protection analysis on the federal enclave issue is without merit. It is true that *Evans* did undertake an equal protection analysis, but it did so only *after* dealing with the federal enclave issue (*i.e.*, no "state" within a state). That is, the *Evans* Court first concluded that enclave residents were still residents of the state and only then addressed the defendants' contention that, even if the enclave residents were still residents of the state, the state could still restrict the right of its residents to vote. *See Evans*, 398 U.S. at 422. Similarly, the *Evans* Court's reference to enclave residents' being, *e.g.*, required to register their cars in the state or being able to resort to state court for divorce and child adoption proceedings, *see id.* at 424, was completely independent of the federal enclave issue and had to do instead with whether the limitation on the vote was justified as a way to make sure that only those citizens "who are primarily or substantially interested in or affected by electoral decisions have a voice in making them." *Id.* at 422.

Sixth, even if *Evans* did suggest that there could be an equal protection overlay on a federal enclave issue, Mr. Kasperzyk has not established that such an analysis would work in his favor. Contrary to what Mr. Kasperzyk asserts, rational basis review would apply here and not some kind of heightened scrutiny because the purported "discrimination" here is not between persons with disabilities and persons without disabilities; rather, it is between persons on the federal enclave (*i.e.*, those without the benefit of current state law) and persons outside the federal enclave (*i.e.*, those with the benefit of current state law). Even in that regard, the distinction between the rights of persons with disabilities within the Presidio and outside the Presidio is not as stark as Mr. Kasperzyk portrays. Even in the absence of FEHA, *federal* anti-discrimination laws would be applied within the enclave – at least SSS has so conceded. *See* Reply at 10 (indicating that Mr. Kasperzyk could sue for "federal civil rights laws and employment compensation laws").

Finally, *Evans* can easily be reconciled with the *Paul* analysis – *i.e.*, residents of the federal enclave had the right to vote in local elections before the federal enclave was established, *see Evans*, 398 U.S. at 421 (noting that, before the cession of the federal enclave, "persons who resided on NIH grounds could register and vote in Montgomery County"), and therefore should have been permitted to exercise that right thereafter; this is consistent with the *Paul* rule.

15

United States District Court

For the Northern District of California

1    For the foregoing reasons, the Court rejects Mr. Kasperzyk's contention that, under *Howard*

2 and *Evans*, modern state law should govern so long as its application would not interfere with a

3 federal government interest.  Rather, until it is overruled, *Paul* continues to provide the controlling

4 standard on the federal enclave doctrine.

5    That being said, Mr. Kasperzyk's criticism that the *Paul* rule cannot be as strict as it might

6 seem on its face is not without merit.  That is, if *Paul* stands for the proposition that no state law

7 developed after the establishment of the federal enclave can apply to the enclave (absent

8 congressional approval or reservation by the state), then why does "modern" state law in areas such

9 as marriage, probate, vehicle registration, education, and so forth still seem to apply on federal

10 enclaves?  Several theories have been advanced as an explanation.  For example:

11 (1)    that *Paul* admits of an exception to the rule, *i.e.*, where the new state law is simply a

12        continuation of the same basic scheme in effect before establishment of the federal enclave,

13        *see Paul*, 371 U.S. at 269 (stating that "if there were price control of milk at the time of the

14        acquisition [of the federal enclave] and the *same basic scheme has been in effect since that*

15        *time*, we fail to see why the current one, albeit in the form of different regulations, would not

16        reach those purchases and sales milk on the federal enclave"; "the current price controls over

17        milk are applicable to these sales, provided the basic state law authorizing such control has

18        been in effect since the times of these various acquisitions") (emphasis added);

19 (2)    that, where there is no federal law on point, state law can be used to fill in the gaps, *cf.*

20        *Stewart*, 309 U.S. at 99-100 (1940) (stating that the language of the Constitution "has long

21        been interpreted so as to permit continuance until abrogated of those rules existing at the

22        time of the surrender of sovereignty which govern the rights of the occupants of the territory

23        transferred" as "[t]his assures that no area . . . will be left without a developed legal system

24        for private rights"); and

25 (3)    that, "in the area of the rights of federal enclave residents to state *benefits*, there has been a

26        trend in state courts to hold that the exclusive jurisdiction of Congress does not deprive

27        enclave residents of benefits which would otherwise be theirs" (*e.g.*, the right to vote, the

28

16

United States District Court

For the Northern District of California

1    right to relief benefits, and the privilege of using public schools).  *In re Terry Y.*, 101 Cal.

2    App. 3d 178, 181 (1980) (emphasis added).

3        For purposes of this opinion, the Court need not define what the exact parameters are for

4    exceptions to the *Paul* rule.  Even if there are "carve outs" to the federal enclave doctrine, Mr.

5    Kasperzyk has not shown that his situation is analogous to those situations were an exception was

6    made (or seems to have been made) such that there should also be a comparable carve out for him.

7    As to (1), Mr. Kasperzyk has not shown that FEHA represents the continuation of the same basic

8    scheme of California law in effect since 1897.  As to (2) that "exception" appears to be largely

9    consistent with *Paul*; in any event, FEHA is not a rule "existing at the time of surrendered

10   sovereignty."  As to (3), enforcement of FEHA is not a state "benefit" found to qualify for an

11   exception to *Paul*.  *Cf. Taylor v. Lockheed Martin Corp.*, 78 Cal. App. 4th 472, 482 (2000) (stating

12   that "[t]he ability to bring a civil action against one's employer under state law is not a 'benefit' in

13   the same sense as voting, public school attendance, or eligibility for welfare payments").

14       For the foregoing reasons, the Court concludes that *Paul* provides the governing analysis and

15   not *Howard* or *Evans*.  Under *Paul*, FEHA does not apply to the Presidio.

16       4.    <u>Section 457</u>

17       Mr. Kasperzyk makes the additional argument that, even if the *Paul* rule is applicable here,

18   Congress has enacted a statute – namely, 16 U.S.C. § 457 – that expressly allows for modern state

19   law to apply on a federal enclave.  That statute (including its heading) provides as follows:

20           Action for death or *personal injury* within national park or other place
             under jurisdiction of United States; application of State laws.

21
22           In the case of the death of any person by the neglect or wrongful act of
             another within a national park or other place subject to the exclusive
23           jurisdiction of the United States, within the exterior boundaries of any
             State, such right of action shall exist as though the place were under
24           the jurisdiction of the State within whose exterior boundaries such
             place may be; *and in any action brought to recover on account of*
25           *injuries sustained in any such place the rights of the parties shall be*
             *governed by the laws of the State within the exterior boundaries of*
26           *which it may be.*

27   16 U.S.C. § 457 (emphasis added).

28

17

United States District Court

For the Northern District of California

1    SSS argues that § 457 has no applicability to the instant case because (1) § 457 covers only

2   personal injury cases (as indicated by the statute's heading) and (2) personal injury has been

3   interpreted to mean only *physical* injury as opposed to, *e.g.*, purely emotional injury[4] or economic

4   injury.  In support of the latter claim, SSS relies on *Kelly v. Lockheed Martin Services Group*, 25 F.

5   Supp. 2d 1 (D.P.R. 1998).

6    The Court's analysis of § 457 begins with the text of the statute.  Mr. Kasperzyk correctly

7   points out that the text of § 457 refers only to "injury," and not, *e.g.*, personal injury or physical

8   injury.  Nevertheless, the Court does not agree that this fact means that any kind of injury is

9   encompassed by § 457.  The Court concludes that "injury" for purposes of § 457 means personal

10   injury, as supported by the reference to "personal injury" in the heading of the statute.

11    In his papers, Mr. Kasperzyk contends that the heading of § 457 should be given no weight.

12   But the Supreme Court case he cites simply reflects that

13           the title of a statute and the heading of a section cannot limit the *plain
            meaning* of the text.  For interpretive purposes, they are of use only
14           when they shed light on some *ambiguous* word or phrase.  They are
            but tools available for the resolution of a doubt.  But they cannot undo
15           or limit that which the text makes plain.

16   *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R.*, 331 U.S. 519, 528-29 (1947) (emphasis

17   added); *see also Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (stating that "'the

18   title of a statute and the hearing of a section' are 'tools available for the resolution of a doubt' about

19   the meaning of a statute").  Here, there is ambiguity as to what the term "injury" means, particularly

20   as it is used in the same sentence which addresses the death of a person.  Hence, the title of the

21   statute which refers to "personal injury" is instructive.

22    Moreover, even the cases that Mr. Kasperzyk cites in his brief view "injury" as being

23   personal injury.  *See* Opp'n at 24.  *See, e.g.*, *Vasina v. Grumman Corp.*, 644 F.2d 112, 118 (2d Cir.

24   1981) ("conclud[ing] that § 457 envisions the application of the current substantive law of the

25   surrounding state in actions for death or *personal injury* occurring within a federal enclave")

26   (emphasis added); *Stokes v. Adair*, 265 F.2d 662, 665 (4th Cir. 1959) (stating that, in § 457, "express

27   _____

28           [4] Purely emotional injury is emotional injury divorced from any accompanying physical
     injury.

18

United States District Court

For the Northern District of California

provision was made that in actions for death or *personal injury* in places subject to the exclusive jurisdiction of the United States, the rights of the parties shall be governed by the laws of the state within whose exterior boundaries the wrong occurs") (emphasis added); *cf. Mater v. Holley*, 200 F.2d 123, 124 (5th Cir. 1952) (noting that § 457 "expressly adopt[s] as federal law the local law of liability for negligence and wrongful death for places over which the United States has exclusive jurisdiction"). This is consistent with Supreme Court case law. *See Gulf Offshore Co., Div. of Pool Co. v. Mobil Oil Corp.*, 453 U.S. 473, 481 (1981) (in a parenthetical, describing § 457 as follows: "*personal injury* and wrongful-death actions involving events occurring 'within a national park or other place subject to the exclusive jurisdiction of the United States, within the exterior boundaries of any State' shall be maintained as if the place were under the jurisdiction of the State") (emphasis added); *The Tungus v. Skovgaard*, 358 U.S. 588, 609 n.9 (1959) (stating that § 457 "makes applicable state death acts (as well as state personal injury law generally) to torts 'within a national park or other place subject to the exclusive jurisdiction of the United States'").

On the other hand, SSS's contention that "personal injury" means only physical injury is problematic. The Court acknowledges that a district court in Puerto Rico has so found. *See Kelly*, 25 F. Supp. 2d at 1. More specifically, the *Kelly* court indicated that "injury" as used in the second clause in § 457 has to mean physical injury because of the structure of the statute – *i.e.*, because the first clause of the statute, which deals with the death of a person, is linked to the second clause of the statute, which deals with injury to a person. *See id.* at 8-9 (stating that, "[i]n enacting [§ 457], Congress meant to provide relief for death or personal – that is, physical – injuries caused by the neglect or wrongful act of another in a federal enclave[;] [u]nder this reading, the two clauses of the statute are linked in their purpose of providing relief for persons physically harmed in federal enclaves"). But even if, at the time that § 457 was enacted, personal injury was understood under the common law to mean physical injury and not, *e.g.*, purely emotional injury, that does not mean that § 457 freezes into its scope a historic and static view of what can constitute personal injury. In fact, at least two circuit courts have indicated to the contrary with respect to wrongful death law. *Cf. Ferebee v. Chevron Chem. Co.*, 736 F.2d 1529, 1533-34 (D.C. Cir. 1984) (rejecting "the position that Section 457 requires the wrongful death law on federal enclaves to be frozen at the date of

United States District Court
For the Northern District of California

1   cession" – *i.e.*, "that Congress intended a static, rather than a dynamic, incorporation of state law";

2   rather, "Congress intended to allow the federal action to evolve concomitantly with changes in state

3   law"); *Vasina*, 644 F.2d at 117 (stating that "[t]he natural reading of the statutory language is that

4   the wrongful-death law of a federal enclave should be identical to that of the surrounding state,

5   whatever that law might be and however it might change over time").  Accordingly, the Court

6   concludes that, even if purely emotional injury was not recognized as a personal injury at the time of

7   § 457's enactment, under current state law, personal injury is broad enough to encompass purely

8   emotional injury.  Purely emotional injury is still an injury to a person even if there is no

9   accompanying physical injury.[5]  *See, e.g.*, Black's Law Dictionary 802 (8th ed. 1999) (defining

10  "personal injury" in a negligence action as "any harm caused to a person, such as a broken bone, a

11  cut, or a bruise; bodily injury," but also defining the term as "[a]ny invasion of a personal right,

12  including mental suffering and false imprisonment").

13      That being said, to the extent Mr. Kasperzyk is asking for economic injury, he has provided

14  no support for the proposition that personal injury can reasonably be understood to cover economic

15  injury, whether under past or current state law.  *Cf. Exxon Shipping Co. v. Baker*, 554 U.S. 471, 508

16

17      [5] Although the Court finds that "personal injury" as used in § 457 can cover purely emotional
18  injury, it does not do so based on Mr. Kasperzyk's analogy to the FTCA.  While the FTCA uses the
    term "personal injury," the Act refers not just to "personal injury" but also to "injury" broadly.  *See*
19  28 U.S.C. § 1346(b) (providing that district courts "shall have exclusive jurisdiction of civil actions
    on claims against the United States, for money damages, accruing on and after January 1, 1945, for
20  *injury* or loss of property, or *personal injury* or death caused by the negligent or wrongful act or
    omission of any employee of the Government while acting within the scope of his office or
21  employment, under circumstances where the United States, if a private person, would be liable to the
    claimant in accordance with the law of the place where the act or omission occurred").  Furthermore,
22  the Supreme Court has indicated that, where two statutes use the same language, "it is appropriate to
    presume that Congress intended that text to have the same meaning in both statutes" when the
    statutes have "similar purposes, [and] particularly when one is enacted shortly after the other."
23  *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005).  *But see Securities Indus. Ass'n v. Board of Gov.*
    *of Fed. Res. Sys.*, 468 U.S. 137, 174-75 (1984) (O'Connor, J., dissenting) (stating that, "[i]n
24  determining the meaning of a term in a particular statute, the meaning of the term in other statutes is
    at best only one factor to consider, and it may turn out to be utterly irrelevant in particular
25  cases[;]Congress need not, and frequently does not, use the same term to mean precisely the same
    thing in two different statutes, even when the statutes are enacted at about the same time").  Here, it
26  is difficult to argue that § 457 and the FTCA have similar purposes.  The former is about liability on
    a federal enclave, regardless of who the defendant is; the latter is about the liability of the federal
27  government as a defendant and the scope of the waiver of the sovereign immunity.  In addition, the
    two statutes were enacted at significantly different times (1928 and 1948, respectively).  Thus, the
28  FTCA has little, if any, value in construing § 457.

United States District Court

For the Northern District of California

n.21 (2008) ("The common law traditionally did not compensate purely economic harms, unaccompanied by injury to person or property."); *Laine v. United States*, No. C 05-04797 (RS), 2006 U.S. Dist. LEXIS 34765, at \*9 (N.D. Cal. May 19, 2006) ("It is true that beginning some decades ago [citing one case from 1958] a seminal line of California cases began to allow plaintiffs to recover in negligence for purely economic injuries, but only under narrowly prescribed circumstances."); *Smith v. Superior Court*, 10 Cal. App. 4th 1033, 1040 (1992) ("[M]ere negligence will not support a recovery for mental suffering where the defendant's tortious conduct has resulted in only economic injury to the plaintiff.").

Therefore, the Court concludes that Mr. Kasperzyk's FEHA claims are not precluded by the federal enclave doctrine to the extent the relief sought is purely emotional injury because recovery for such injury is permitted under § 457. However, to the extent the relief sought is economic injury, the federal enclave doctrine is a bar as § 457 has no application to economic injury.

In so holding, the Court recognizes that there are a number of cases that have held that a FEHA claim is precluded in its entirety under the federal enclave doctrine. But notably, these cases have not addressed the ramifications of § 457, and therefore they are not dispositive. *See, e.g.*, *Cooper v. Southern Cal. Edison Co.*, No. 03-57059, 2006 U.S. App. LEXIS 11897, at \*3-4 (9th Cir. Mar. 6, 2006); *Haining v. Boeing Co.*, No. 2:12-cv-10704-ODW (MRWx), 2013 U.S. Dist. LEXIS 130111, at \*8-9 (C.D. Cal. Sept. 11, 2013); *Stiefel v. Bechtel Corp.*, 497 F. Supp. 2d 1138, 1147-49 (S.D. Cal. 2007); *Lockhart v. MVM, Inc.*, 175 Cal. App. 4th 1452, 1460 (2009); *Taylor*, 78 Cal. App. 4th at 482.

C.    Claim for Wrongful Termination

The Court's analysis of Ms. Kasperzyk's state law claim for wrongful termination is the same as the analysis above for his FEHA claims, particularly as Mr. Kasperzyk does not dispute that a claim for wrongful termination did not exist under California law in 1897. *See* Opp'n at 23 (arguing that the wrongful termination claim is permitted based on § 457). That is, the claim is barred to the extent Mr. Kasperzyk seeks relief for economic injury (§ 457 is not applicable) but is not barred to the extent he seeks relief for purely emotional injury (§ 457 is applicable).

///

United States District Court
For the Northern District of California

C.      Claim for Intentional Infliction of Emotional Distress

        Similarly, the Court's analysis of Ms. Kasperzyk's claim for intentional infliction of

emotional distress is the same as above, as Mr. Kasperzyk does not dispute that such a claim did not

exist under California law in 1897.  *See* Opp'n at 23.  That is, the claim is not barred because, here,

Mr. Kasperzyk is seeking only relief for purely emotional injury (§ 457 is applicable), and not

economic injury.  As above, the Court acknowledges that many courts (including the Ninth Circuit

in the unpublished *Cooper* decision) have held that a claim for intentional infliction of emotional

distress is barred by the federal enclave doctrine, but those courts have not undertaken a § 457

analysis as here.

D.      Breach-of-Contract Claim – SSS and Letterman

        As indicated above, Mr. Kasperzyk has three claims for breach of contract, the first of which

is predicated on the contract entered into between SSS and Letterman.  According to Mr. Kasperzyk,

the security services contract included a provision (¶ 8(b)) stating that "'[t]he Company shall not

take any action contrary to any applicable law, rule, regulation or order prohibiting discrimination

against employees . . . on the basis of . . . disability . . . or contrary to any other provision of law of

this Agreement.'"  FAC ¶ 32.  Mr. Kasperzyk maintains that he was a third-party beneficiary of the

contract and that SSS breached the contract by discriminating against him on the basis of disability.

*See* FAC ¶¶ 54-55.

        As a preliminary matter, the Court takes note that this claim for breach of contract is

dependent on Mr. Kasperzyk's FEHA or wrongful termination claims surviving[6] (*i.e.*, because the

contract term provides that SSS shall abide by the applicable law prohibiting disability

discrimination).[7]  Because the Court has held that the FEHA and wrongful termination claims

---

[6] Mr. Kasperzyk has not suggested a breach by SSS's failure to comply with, *e.g.*, the ADA.

[7] SSS does not assert that the *Paul* rule bars per se a claim for breach of contract which has
long existed under the common law.  Rather, SSS invokes the federal enclave doctrine only to the
extent there is a contract term providing that SSS will comply with applicable anti-discrimination
law.

        The Court also notes that Mr. Kasperzyk has not argued that, in the contract, the parties
agreed that only state law would govern (*i.e.*, displacing the law that would otherwise govern under
the federal enclave doctrine).  Indeed, the language of the contract term indicates otherwise – stating

survive in part (because of § 457), it must address SSS's contention that the contract claim is still deficient because, as a matter of law, Mr. Kasperzyk could not be deemed a third-party beneficiary of the contract entered into by SSS and Letterman.  SSS maintains that it is clear from the plain language of the contract (¶ 13) that Mr. Kasperzyk cannot be deemed a third-party beneficiary of the agreement.[8]  Paragraph 13 provides in relevant part as follows:

> The services provided pursuant to this Agreement are solely for the benefit of Company [*i.e.*, Letterman], Company's parent, subsidiary and affiliated business units, LDAC tenants and the Presidio Trust, and neither this Agreement nor any service rendered hereunder shall give rise to or confer any right on any other person or entity as a third party beneficiary or otherwise.

Mot., Ex. A (Independent Contractor Agreement ¶ 13).

The Court rejects SSS's argument.  The test for determining whether a contract was made for the benefit of a third person turns on the intent of the contracting parties.  *See Prouty v. Gores Tech. Grp.*, 121 Cal. App. 4th 1225, 1232 (2004).  "Whether the third party is an intended beneficiary or merely an incidental beneficiary involves construction of the intention of the parties, gathered from reading the contract as a whole in light of the circumstances under which it was entered."  *Id.* at 1233 (internal quotation marks omitted).  Thus, the issue of third-party beneficiary is generally a factual question.  *See id.* (stating that "[g]enerally, it is a question of fact whether a particular third person is an intended beneficiary of a contract").  Factual issues are typically not disposed of on a 12(b)(6) motion.

The fact that the contract at issue in the instant case contains a clause that seems to bar third-party beneficiaries is not dispositive.  *See Green Desert Oil Group v. BP West Coast Prods.*, No. C 11-02087 CRB, 2011 U.S. Dist. LEXIS 131140, at *9 (N.D. Cal. Nov. 14, 2011) (stating that "a

---

that only "applicable" law will govern SSS's conduct.

[8] SSS has provided the Court with a copy of excerpts from the contract, *see* Mot., Ex. B, and Mr. Kasperzyk does not seem to dispute that the copy submitted in fact authentic.  *See Davis v. HSBC Bank*, 691 F.3d 1152, 1160 (9th Cir. 2012) (providing that, "[u]nder the 'incorporation by reference' doctrine in this Circuit, 'a court may look beyond the pleadings without converting the Rule 12(b)(6) motion into one for summary judgment'[;] [s]pecifically, courts may take into account 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading'").

United States District Court

For the Northern District of California

23

United States District Court

For the Northern District of California

1  contract clause limiting, or even barring, third party beneficiaries is not dispositive"). This is borne

2  out by the *Prouty* case which Mr. Kasperzyk cites in his opposition and which SSS failed to address

3  in either its opening brief or reply.

4      In *Prouty*, the defendant-company GTG entered into a contract with HP pursuant to which

5  GTG agreed to purchase from HP all of the capital stock of VeriFone. One of the provisions in the

6  GTG-HP contract was that GTG would offer employment to all VeriFone employees and that GTG

7  would not terminate any VeriFone employees during the first 60 days after closing the stock sale.

8  GTG also agreed to indemnify HP for any loss which arose out of GTG's termination of an

9  employee after the closing, including termination during the first 60 days. *See Prouty*, 121 Cal.

10  App. 4th at 1227-28. After GTG fired certain employees within the first 60 days, those individuals

11  filed suit against GTG. *See id.* at 1229.

12      The state court held that,

13      [a]pplying the law of third party beneficiaries to the language of the
        contract discloses GTG and Hewlett-Packard expressly intended to
14      grant plaintiffs the promises contained in section 6 of the amendment.
        Indeed, section 6 is a classic third party provision. It is patently
15      intended to preclude early termination of the affected employees . . . .
        The provision expressly benefits them, and only them.
16          . . . . Moreover, in agreeing not to terminate employees . . . ,
        GTG agreed to extend its indemnity obligations towards Hewlett-
17      Packard to include any breaches on the . . . promise. It is difficult for
        GTG to argue section 6 did not intend to benefit plaintiffs when GTG
18      gained nothing from agreeing to its terms.

19  *Id.* at 1233. The court also noted that "[t]he uncontradicted facts of the amendment's negotiation

20  also disclose Hewlett-Packard and GTD intended to benefit plaintiffs." *Id.* at 1234,

21      Significantly, the court acknowledged that there was another provision in the contract (§

22  10.5) that on its face seemed to bar third-party beneficiaries. That provision read as follows: "'This

23  Agreement . . . [is] not intended to confer upon any Person other than the parties hereto, the

24  Company, the Company Subsidiaries, the Purchaser Indemnified Persons and the Seller Indemnified

25  Persons any rights or remedies hereunder.'" *Id.* at 1227 n.1. The court stated that § 6 and § 10.5

26  clearly were in conflict, *see id.* at 1235 (stating that the provisions "cannot be harmonized");

27  however, "under well established principles of contract interpretation, when a general and specific

28

24

United States District Court

For the Northern District of California

1    provision are inconsistent, the particular and specific provision is paramount to the general

2    provision.  Section 6 . . . thus is an exception to section 10.5 . . . , and plaintiffs can enforce it."  *Id.*

3           In light of *Prouty*, "it is at least plausible that [Mr. Kasperzyk] might prove a) that certain

4    provisions of the [SSS-Letterman contract] were intended to benefit [persons such as himself] and b)

5    that these provisions thus give rise to [his] third party breach of contract claim against [SSS], in spite

6    of the [contract] language that it does not create any rights in a third party."  *Milmoe v. Gevity HR,*

7    *Inc.*, No. C 06-04721, 2006 U.S. Dist. LEXIS 71121, at *13 (N.D. Cal. Sept. 20, 2006) (Armstrong,

8    J.) (internal quotation marks omitted); *see also Jajco, Inc. v. Leader Drug Stores, Inc.*, No. C 12-

9    05703 PJH, 2013 U.S. Dist. LEXIS 77830, at *22-23 (N.D. Cal. May 31, 2013) (Hamilton, J.)

10   (stating that, "[b]ecause the general disclaimer of third party beneficiaries is inconsistent with the

11   particular provisions that may be reasonably construed to confer a right or benefit to participating

12   pharmacies such as Anchor, this matter presents a factual dispute that is not suitable for resolution

13   on a motion to dismiss").  Indeed, who else would be expected to benefit from the anti-

14   discrimination provision other than employees of SSS?  The Court therefore denies the motion to

15   dismiss the contract claim based on the contract between SSS and Letterman.

16   E.    <u>Breach-of-Contract Claim – SSS and Local Union</u>

17          Mr. Kasperzyk's second claim for breach of contract is based on the contract entered into

18   between SSS and the local union.[9]  The contract with the union included a provision (Article 3) that

19   stated:

20                  "The Union and the Company agree that they shall not discriminate in
                    violation of federal and state law against any . . . employee in hiring,
21                  promotions, assignments, suspensions, discharge, terms and conditions
                    of employment, wages, training, recall or lay-off status . . . against a
22                  qualified individual with a disability (defined by the Americans with
                    Disabilities Act)."

23

24   FAC ¶ 18.  The contract also included a provision (Article 27.2) that stated:

25                  "If a customer demands that the Company remove an employee from
                    further employment at a location, the Company shall have the right to
26

27          [9] SSS has provided the Court with a copy of excerpts from the collective bargaining
     agreement, *see* Mot., Ex. B, and Mr. Kasperzyk does not seem to dispute that the copy submitted is
28   in fact authentic.

25

comply with such demand.  However, unless the Company has cause to discharge the employee, the company will use its best efforts to place him/her in another job in the same County not to exceed ten (10) miles from the job site from which he or she was removed, and schedule said employee with no loss of wages, seniority or benefits and with the same shift."

FAC ¶ 19.  Mr. Kasperzyk maintains that he was a third-party beneficiary of the contract and that SSS breached the contract (a) by discriminating against him on the basis of disability and (b) by failing to use its best efforts to place him in another job after terminating him in November 2010.  *See* FAC ¶¶ 61-62.

   1. <u>Breach by Discrimination</u>

  Similar to above, this claim for breach of contract is dependent on Mr. Kasperzyk's FEHA or wrongful termination claims surviving (*i.e.*, because the contract term provides that SSS shall not discriminate in violation of federal and state law).[10]

  Because the Court has concluded that the FEHA and wrongful termination claims can survive (at least in part) the "federal enclave" review above, the Court must address SSS's contention that the contract claim is still deficient because it is preempted.  More specifically, SSS argues that, "[t]o ascertain whether the terms of the union contract were breached, this Court would need to interpret the union contract's terms and provisions" and "[s]uch interpretation is preempted by the National Labor Relations Act, which mandates that such interpretation be relegated to the NLRB."  Mot. at 13.

  In support of this argument, SSS relies primarily on *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959).  However, in that case, the Supreme Court simply indicated that claims implicating 29 U.S.C. § 157 or § 158 (concerning organizing rights and unfair labor practices) were to be decided by the NLRB.[11]  *See id.* at 244-45 (noting that "courts are not the

---

[10] Mr. Kasperzyk has not suggested a breach by SSS's failure to comply with, *e.g.*, the ADA.

[11] Section 157 provides, *inter alia*, that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."  29 U.S.C. § 157.

Section 158, in turn, provides, *inter alia*, that "[i]t shall be an unfair labor practice for an

United States District Court

For the Northern District of California

primary tribunals to adjudicate" issues such as whether certain activity regulated by a state is governed by § 157 or § 158; "[i]t is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board"). Here, neither § 157 or § 158 is implicated. Rather, at most, Mr. Kasperzyk would seem to be making a § 301 claim (*i.e.*, a claim pursuant to 29 U.S.C. § 185).[12] *See* 29 U.S.C. § 185(a) (providing that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act . . . may be brought in any district court of the United States having jurisdiction of the parties").

Courts have concurrent jurisdiction over § 301 claims with the NLRB. A court is only to defer to the NLRB's jurisdiction where a § 301 case falls within the NLRB's "primary jurisdiction." *See SEIU v. St. Vincent Med. Ctr.*, 344 F.3d 977, 983 (9th Cir. 2003) (stating that "federal courts 'must tread lightly' in areas of the NLRB's primary jurisdiction and must defer to the NLRB 'when, on close examination, section 301 cases fall within the NLRB's primary jurisdiction'"). "'The doctrine of primary jurisdiction is a recognition of congressional intent to have matters of national labor policy decided in the first instance by the National Labor Relations Board.'" *United Ass'n of Journeymen v. Valley Eng'rs*, 975 F.2d 611, 613 (9th Cir. 1992). In essence, to determine whether a case is within the NLRB's primary jurisdiction, a court must ask whether the major issues to be decided can be characterized as primarily representational or primarily contractual. *See St. Vincent Med. Ctr.*, 344 F.3d at 983. Only issues that are primarily representational fall within the NLRB's primary jurisdiction. *See id.*; *see also United Ass'n of Journeymen*, 975 F.2d at 613; *Stanford Hosp.*

---

employer – (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [29 U.S.C. § 157]; (2) to dominate or interfere with the formation or administration of any labor organization . . . ; (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization; [etc]." *Id.* § 157.

[12] While Mr. Kasperzyk has arguably pled only a common law claim for breach of contract, the Court interprets the claim as one for breach of contract pursuant to § 301. *See Cramer v. Consol. Freightways, Inc.*, 255 F.3d 683, 689 (9th Cir. 2001) (noting that, under § 301, suits for violation of contracts between an employer and a union may be brought in federal court; that § 301 authorizes federal courts to develop a federal common law of collective bargaining agreement interpretation; and that this federal common law preempts use of state contract law in collective bargaining agreement interpretation and enforcement).

1   & *Clinics v. SEIU, Local 715*, No. C 07-5158 JF (RS), 2009 U.S. Dist. LEXIS 18759, at *21-22

2   (N.D. Cal. Mar. 11, 2009) (noting that "[i]ssues falling within the NLRB's primary jurisdiction

3   include designation of an exclusive bargaining agent and identification of an appropriate collective

4   bargaining unit under § 9 of the Labor Relations Management Act[;] [s]uch 'representational issues'

5   are 'more appropriately resolved by the NLRB' than by the courts given the agency's 'superior

6   expertise'").

7        Here, SSS has failed to explain how the issues in the claim for breach of contract pending in

8   the instant case are primarily representational as opposed to primarily contractual.  Therefore, SSS's

9   attempt to invoke the NLRB's primary jurisdiction is rejected.

10        Somewhat surprisingly, in his opposition, Mr. Kasperzyk brings up a related issue that is not

11   even raised by SSS's motion – *i.e.*, that, even though, typically, a plaintiff must have exhausted his

12   or her grievance procedures before bringing a § 301 claim before a court, there are exceptions to this

13   rule (which Mr. Kasperzyk argues are applicable here).  Because SSS did not make an exhaustion

14   argument, the Court does not address the merits of any such argument here.

15        2.        Breach by Failure to Use Best Efforts

16        As noted above, Mr. Kasperzyk claims breach of the collective bargaining agreement not

17   only because SSS violated anti-discrimination law but also because SSS failed to use its best efforts

18   to place him in another job.  As to this claim, SSS makes the same argument that, "[t]o ascertain

19   whether the terms of the union contract were breached, this Court would need to interpret the union

20   contract's terms and provisions" and "[s]uch interpretation is preempted by the National Labor

21   Relations Act, which mandates that such interpretation be relegated to the NLRB."  Mot. at 13.  For

22   the reasons discussed above, that argument lacks merit.

23   F.   Breach-of-Contract-Claim – Mediation

24        Mr. Kasperzyk's final claim for breach of contract is based on the oral agreement made

25   during the mediation (part of the union grievance process) in April 2011.  According to Ms.

26   Kasperzyk, SSS made an offer to reinstate him, which he accepted, and SSS subsequently violated

27   that agreement by failing to re-employ him.  *See* FAC ¶¶ 65-66.  In its motion, SSS argues that this

28   contract claim should be dismissed because (1) it is based on confidential communications that are

United States District Court

For the Northern District of California

1  protected from disclosure by the California Evidence Code, *see* Cal. Evid. Code § 1119(a), (c)

2  (providing that "[n]o evidence of anything said . . . for the purpose of, in the course of, or pursuant

3  to, a mediation or a mediation consultation is admissible"; also providing that "[a]ll

4  communications, negotiations, or settlement discussions by and between participants in the course of

5  a mediation or a mediation consultation shall remain confidential"); (2) any oral agreement would

6  need to be consistent with the provisions of the collective bargaining agreement and interpretation of

7  the latter agreement is exclusively for the NLRB; and (3) any oral agreement would necessarily be

8  contingent on approval from SSS's customer (whether Letterman, Lucasfilm, etc.) and, here, Mr.

9  Kasperzyk admits in his complaint that "the client did not want him back."  Mot. at 14.

10       In response to the first argument, Mr. Kasperzyk argues that the California Evidence Code

11  may bar evidence of confidential communications at a mediation, but not at an arbitration, and, here,

12  even though he referenced a mediation in his FAC, he now believes that the proceeding may have

13  been an arbitration, particularly as the collective bargaining agreement refers to an arbitration and

14  not a mediation.  *See* Opp'n at 22-23; *see also* Mot., Ex. B (CBA, Art. 25) (referring to grievance

15  and arbitration procedure).  Mr. Kasperzyk asserts that, "before discovery is complete, it is

16  impossible to ascertain whether or not the proceedings were in the form of a mediation or an

17  arbitration," Opp'n at 23, and therefore suggests that this issue should not be resolved at the 12(b)(6)

18  phase.  In reply, SSS maintains that Mr. Kasperzyk should be held to the allegations in his

19  complaint, which mention only a mediation and not an arbitration.  *See* Reply at 14.

20       SSS's position regarding mediation confidentiality is not without support.  *See Simmons v.*

21  *Ghaderi*, 44 Cal. 4th 570, 581 (2008) (stating that "mediation confidentiality now clearly applies to

22  prohibit admissibility of evidence of settlement terms made for the purpose of, in the course of, or

23  pursuant to a mediation unless the agreement falls within express statutory exceptions"); *see also*

24  Cal. Evid. Code § 1124 (providing that an oral agreement made during a mediation is not

25  inadmissible or protected from disclosure under certain circumstances).[13]  Nevertheless, that would

26

27  ────────────────

28       [13] Mr. Kasperzyk has not asserted that any of the statutory exceptions to mediation confidentiality apply.

United States District Court

For the Northern District of California

1   only mean a dismissal without prejudice and with leave to amend as it appears that Mr. Kasperzyk

2   has a legitimate basis for arguing that the proceeding may actually have been an arbitration.

3        SSS's remaining arguments should not preclude Mr. Kasperzyk from amending his FAC.

4   The NLRB argument is problematic for reasons discussed above; no representational issue is raised.

5   As for SSS's contention that any oral agreement must have been contingent on customer approval,

6   that may or may not be the case.  The FAC does reflect that Mr. Kasperzyk was allegedly rehired for

7   work on the Presidio and therefore likely at the Letterman Digital Arts Center.  *See* FAC ¶ 38

8   (alleging that Mr. Kasperzyk asked SSS for a written statement that he was being rehired "so that he

9   could show it to the Presidio Trust and maintain his housing").  However, that does not mean that

10   SSS actually stated at the mediation/arbitration that Mr. Kasperzyk's rehire was conditioned on

11   approval by Letterman (or whoever the customer was).  It is possible that SSS mistakenly left out

12   this condition during the settlement negotiations.  What the ramifications of such a mistake would be

13   cannot be resolved at this juncture.

14   G.    Claim for Breach of Implied Covenant of Good Faith and Fair Dealing

15        The claim for breach of the implied covenant of good faith and fair dealing is based on the

16   employment agreement between SSS and Mr. Kasperzyk.  Mr. Kasperzyk asserts that SSS breached

17   the implied covenant because, each time SSS terminated Mr. Kasperzyk, it did not have good and

18   sufficient cause to do so which amounted to an unfair interference with the right of Mr. Kasperzyk

19   to receive the benefit of the contract.  *See* FAC ¶ 73.

20        Mr. Kasperzyk's claim here seems to be predicated on *Hejmadi v. AMFAC, Inc.*, 202 Cal.

21   App. 3d 525 (1988).  *See* Opp'n at 21 (citing *Hejmadi*).  There, the state court noted that, if an

22   employment relationship was terminable *at will*, then there could be no claim for breach of the

23   implied covenant.  "[W]here the at-will employment relationship is terminated, the employee cannot

24   complain about a deprivation of the benefits of continued employment, for the agreement never

25   provided for a continuation of its benefits in the first place."  *Hejmadi*, 202 Cal. App. 3d at 547.

26   However, where the employee has pleaded and proved an *implied good cause limitation on the*

27   *employer's right to discharge*, then there can be a claim for breach of the implied covenant as "the

28   employee has a reasonable expectation of continuing benefits from the agreement absent good cause

30

United States District Court
For the Northern District of California

1    for termination."  *Id.* at 648; *cf. Haycock v. Hughes Aircraft Co.*, 22 Cal. App. 4th 1473, 1490 (1994)

2    (stating that "[t]he existence of an implied contract to discharge only for good cause is normally a

3    factual question for the trier of fact").

4           In its motion, SSS argues that the claim for breach of the implied covenant should be

5    dismissed because Mr. Kasperzyk "was indisputably an at-will employee of [SSS]."  Mot. at 11-12.

6    In reply, Mr. Kasperzyk contends that his employment was not at will; rather, there was an express

7    or implied good cause limitation on SSS's right to discharge by virtue of the collective bargaining

8    agreement signed by SSS, which provides in relevant part (§ 4.1) that SSS "'shall be free to

9    discharge employees for refusal to obey lawful orders, in competency [sic], misrepresentation,

10   intoxication, or any just cause.  An employee who has not completed his or her probationary period

11   may be disciplined or discharged without just cause.'"  Opp'n at 21.

12          Mr. Kasperzyk's position has merit – at least, one could argue that he and other employees

13   like him were intended third-party beneficiaries of the collective bargaining agreement with respect

14   to the above provision.  But, contrary to what Mr. Kasperzyk suggests in his papers, he did not make

15   any reference to § 4.1 of the collective bargaining agreement in the FAC.  Therefore, the Court shall

16   dismiss the claim as pled in the FAC but give Mr. Kasperzyk leave to amend so that he can clarify

17   his claim for breach of the implied covenant is based on § 4.1 of the collective bargaining

18   agreement.  Consistent with footnote 12, *supra*, this claim would be in effect a § 301 claim.

19   H.     Fraud Claim

20          In the fraud claim, Mr. Kasperzyk alleges that, when SSS promised to reinstate him at the

21   mediation/arbitration in April 2011, it knew the promise was false.[14]  *See* FAC ¶¶ 97-98.  According

22   to Mr. Kasperzyk, he relied on the promise by foregoing any claims in union mediation/arbitration in

23   exchange for getting his job back.  *See* SAC ¶ 99.  In its motion, SSS argues that the claim should be

24   dismissed because Mr. Kasperzyk has alleged in the FAC that the promise came during a mediation

---

[14] Presumably, Mr. Kasperzyk maintains that SSS knew the promise was false at the time
because it terminated him only two days after the promise.  *See Tenzer v. Superscope*, 39 Cal. 3d 18,
30 (1985) (stating that "'something more than nonperformance is required to prove the defendant's
intent not to perform his promise'"; adding that "fraudulent intent has been inferred from such
circumstances as defendant's insolvency, his hasty repudiation of the promise, his failure even to
attempt performance, or his continued assurances after it was clear he would not perform").

**United States District Court**
For the Northern District of California

1   and mediation communications are protected from disclosure under the California Evidence Code.

2   SSS further argues that, even if this problem could be overcome, Mr. Kasperzyk "has failed to plead

3   fraud in that he has neither shown false representation, justifiable reliance or for that matter,

4   cognizable damages." Mot. at 17.

5          For the reasons discussed above, although SSS's first argument is not without merit, that

6   deficiency can be remedied upon amendment (*i.e.*, so that Mr. Kasperzyk may allege an arbitration

7   in lieu of a mediation). But to the extent SSS has also taken the position that Mr. Kasperzyk has

8   failed to plead all elements in support of a fraud claim, that position is without merit. Mr.

9   Kasperzyk has alleged that the false representation was the representation that he would be

10  reinstated when in fact SSS knew at the time that it would not reinstate him. *See* FAC ¶¶ 97-98. He

11  has also alleged that he relied on the promise, *e.g.*, by foregoing claims in union

12  mediation/arbitration in exchange for getting his job back. *See* FAC ¶ 99. Finally, he has alleged

13  that, as a result of SSS's fraud, he has suffered damages, including loss of wages/salary. *See* FAC ¶

14  102. In its reply brief, SSS does not go any further to explain how the elements have not been

15  properly pleaded, and therefore dismissal is not warranted.

16                          **III.   CONCLUSION**

17         For the foregoing reasons, the Court grants in part and denies in part SSS's motion to

18  dismiss. More specifically:

19  (1)    FEHA and wrongful termination claims. The motion to dismiss is granted in part and denied

20         in part. The claims are dismissed only to the extent they seek relief for economic injury. To

21         the extent the claims seek relief for purely emotional injury, they are viable.

22  (2)    Claim for intentional infliction of emotional injury. The motion to dismiss is denied.

23  (3)    Breach-of-contract claim – SSS and Letterman. The motion to dismiss is denied.

24  (4)    Breach-of-contract (§ 301) claim – SSS and the local union. The motion to dismiss is

25         denied.

26  (5)    Breach-of-contract claim – mediation. The motion to dismiss is granted but Mr. Kasperzyk

27         may amend this claim to clarify that the breach took place with respect to an agreement made

28         at an arbitration, and not a mediation.

**United States District Court**
For the Northern District of California

(6)   Claim (§ 301) for breach of the implied covenant of good faith and fair dealing.  The motion

to dismiss is denied.

(7)   Fraud.  The motion to dismiss is granted but Mr. Kasperzyk may amend the claim to clarify

that there was an arbitration rather than a mediation.

Mr. Kasperzyk has leave to file an amended complaint within thirty (30) days of the date of this

order.

The Court notes that, technically, Mr. Kasperzyk will be filing a third amended complaint

("TAC").  For efficiency purposes, the Court orders that no defendant, including but not limited to

Lucasfilm, shall file a response to the SAC (*i.e.*, the current operative complaint).  Rather, upon Mr.

Kasperzyk's filing of the TAC, Defendants shall have thirty (30) days thereafter to file a response to

the TAC, whether by answer or motion.  If Mr. Kasperzyk does not file a TAC within the above time

parameters, then – and only then – shall Defendants be obligated to file a response to the SAC.

This order disposes of Docket No. 22.


IT IS SO ORDERED.


Dated:  January 3, 2014


_____
EDWARD M. CHEN
United States District Judge